# ROBERT R. DICKEY v. DEPARTMENT OF REVENUE

Robert R. Dickey, Attorney at Law, Medford, represented himself.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered December 22, 1971.

CARLISLE B. ROBERTS, Judge.

Cases 562 and 595 were consolidated for trial. Each involved the value of a service station site located on Valley View Road, adjacent to the North Ashland Interchange of federal highway I-5, Jackson County, Oregon, the legal description being recorded as Account No. 381E32-500, Code 5-8, consisting of approximately seven-tenths acres of land. Case No. 562 requires the determination of the true cash value of the subject property as of January 1, 1969, and is on appeal to this court pursuant to ORS 306.545 (the Department of Revenue having failed to act upon plaintiff's petition for hearing for more than 12 months and the petition therefore being deemed denied); case No. 595 requires the determination of true cash value of the subject property as of January 1, 1970, and is an appeal from the Department of Rev-

enue's Order No. VL 71-262, dated March 30, 1971, sustaining the order of the Jackson County Board of Equalization. In both years the true cash value is on the roll at $34,250. The plaintiff contends that the value in both years should be $21,000. In both cases we are dealing with a site value, the value of land only, located in a rural area on a county road immediately adjacent to an interstate freeway, the subject property being leased by the owner to a major oil company for a period of 20 years plus two options for an additional five years each.

*Encyclopedia of Real Estate Appraising* 849, ch 40, "Gasoline Service Station Appraisal," (Friedman, ed, Rev Ed 1970), emphasizes at 850:

> "* * * Service station property has special features of location that are suited to service station use to a greater degree than property adjacent to it, across the street, or in close proximity. * * *"

See also special articles on factors and trends in appraising service stations found in 4 Assessors J 65-74 (No. 2, July 1969); 5 Assessors J 47-59 (No. 3, October 1970); XXIV The Appraisal J 393-398 (No. 3, July 1956); XXXVI The Appraisal J 559-567 (No. 4, October 1968); and XXXIX The Appraisal J 82-93 (No. 1, January 1971).

The court did not find the testimony of either plaintiff or defendant sufficient to support their respective views. The sole witness for the defendant was an appraiser of several years' experience in the office of the assessor. He had prepared an appraisal report (Defendant's Exhibit A) which contained a quantity of pertinent, useful information—and a number of puzzles. In his testimony he gave lip service, at least, to the view that "site" of a service station is

vital, not the number of square feet it contains. As stated in *Encyclopedia of Real Estate Appraising, supra,* at 858:

> "Land for a service station is bought as a 'site.' Assuming that the plot is 'large enough to do the job', the typical buyer will think not in terms of front foot price or square foot price, but in terms of 'site cost.' The market for service station sites does not pay much attention to unit values. In comparing properties in service station evaluation, the appraiser tends, therefore, to balance site against site, rather than unit value against unit value, for this is what actually happens in the market place."

The witness testified that he used the income approach to value but in his report he lists nine alleged "comparable" sites for which he noted the square feet of area developed by the lessee oil company and the square feet of undeveloped area, then set a value of $1.45 per square foot for the developed property and ten cents per square foot for the undeveloped property —and all his assessed valuations for the comparable properties are based upon this method. The appraisal cards reflect this method. It was developed at trial that the first information he obtained on the minimum lease payments for subject property was volunteered by the plaintiff at the Department of Revenue's hearing on March 30, 1971, and the information on which he bases his income approach apparently has all been obtained since that time. While stating that the income approach is the best one in the circumstances, he has shown the values attained thereby as "indicated values" only, adhering to the value based upon square feet for use in the actual assessment roll (with no indication in testimony or by exhibit as to what he bases the value of $1.45 per square foot). As to the subject property, he obtained a $34,250 value on the square-

foot basis and a value of $36,000 on the income approach, but settled for the $34,250 originally assessed. He admitted the square-foot rates are misleading in this type of appraisal.

Of course, since the parties are seeking to value land only, the cost approach is not applicable. The sales data approach was not available, since only one sale of a service station site (comparable No. 5) could be found. The defendant's "comparables," quite properly, were leases by landowners of a "site," taken out of larger land holdings because of strategic location. As the plaintiff testified, the landowners do not wish to sell, desiring to preserve their estates. This leaves only the income approach available (which the defendant's witness claimed he followed but, as has been said, it was utilized by him only as an "indication of value," superimposed on his original appraisal report based on data from an unknown benchmark). For the purpose of income, he sought information as to the leases entered into between the landowner and the oil company. He was able to obtain the amount of minimum rental payments per month and ascertained whether the lessor or lessee paid the taxes on the bare land, but did not obtain any information as to gallonage sold per month, the amount of additional payments over the minimum received by the landowners, or provisions in the leases for "cost of living" adjustments. Using the minimum rental per year, he obtained the value of the property by using a capitalization rate of seven, eight or nine percent and, where taxes were paid by the lessee, adding two and one-half percent to account therefor. It was not made clear as to the situations under which seven, eight or nine percent was determined as the proper rate, but he testified that an eight percent rate was acceptable in the community.

The witness' own records indicated that three percent for taxation would be more readily justified than 2.5 percent, and the plaintiff testified that, in his own case, the taxes represented at least 25 percent of the minimum income.

Upon being queried as to the difference in the assessed valuation and that found by the income method, the witness' explanation was unsatisfactory. It reads as follows:

"A * * * Adding these two figures together, we get a figure of $34,247, rounded to $34,250.

"Q That is $1,750 less than what the 10.5 capitalization rate shows. Is that correct?

"A The difference between $36,000 and $34,250 —yes, sir, $1,750.

"Q Well, how come there was even less value than what the capitalization rate showed?

"A We don't try to round upwards or to exceed a value derived. That's one method of value. We haven't got a cost approach or a market approach in this area and there is also the possibility over a six-year period, and probability, that taxes will increase and perhaps the 2.5 rate used for taxes might be reflected a little higher. We believe we're on safer ground by not getting fully up to the capitalized value that is indicated."

The witness admitted that he had "no notes to back up $1.45 square foot value" of the unimproved property.

Page 16 of Defendant's Exhibit A graphically illustrates the road system and the service station sites as to which all the testimony relates. The map shows interstate highway 5 running from north to south through the area, intersected at the north by Fern Valley Road (with comparables No. 1 and No. 2 lo-

cated thereon); intersected further south by Valley View Road (also called the North Ashland Interchange), the site of the subject property, with a Standard Oil Station, comparable No. 3, across the county road from it; and a little over five miles further south, intersected by Highway 66 (also known as the South Ashland Interchange) with comparable sites Nos. 4 to 9 indicated at that junction. It would appear that the plaintiff's grievance has been stimulated by a disparity in the valuation of the subject property and the Standard Station listed as comparable lease No. 3. In comparable No. 3, the bare land, in 1967, 1968 and 1969, was given an assessed value of $25,370, whereas the subject property's site was valued at $34,250 for 1968 and 1969. The plaintiff, a lawyer and an experienced investor, owner and operator in real property in the area, testified that the subject property's lease was far less favorable than that for No. 3 (although No. 3 paid a smaller minimum rental), since the plaintiff as lessor had to pay the taxes and the lessee's product did not have as high a degree of acceptability by the public as in the case of No. 3. (There may have been some corroboration of the plaintiff's contentions as evidenced by the increase of comparable No. 3 in 1970 to an assessed value of $36,000.)

However, as is well known, the plaintiff has the burden of proving his estimate of true cash value by a preponderance of the evidence. He cannot make a case by showing that his competitor's property is underassessed. *Robinson et ux v. State Tax Com.*, 216 Or 532, 339 P2d 432 (1959). The plaintiff agreed with the defendant that the income approach to value was probably the best available but he did not use it himself. Instead, he sought to impeach the defendant's testimony in connection with the income approach,

showing the lack of information obtained by the assessor on that subject, and stressed the importance of gallonage (for which data were not introduced by either witness).

An examination of written materials on the subject indicates that gallonage, as a basis for value, is highly suspect. "Each year, millions of dollars of merchandise is handed out free or sold at cut rates with the purchase of various brands of gasoline." 4 Assessors J, *supra*, 69. See also 5 Assessors J, *supra*, 56. It is stated in XXXIX The Appraisal J, *supra*, 85:

> "The temptation to use gallonage sales for the income approach base confronts the appraiser constantly, though this method can be very unreliable in estimating market value. Such factors as public acceptance of company product, station operating hours, giveaway gimmicks, discounts, loose credit, superior or inferior management, etc. makes it mandatory that the appraiser carefully analyze the station. For example, public acceptance of a company product may cause a station to exceed its potential gallonage or poor public acceptance may cause the station to pump less than its potential share.
>
> "* * * * *
>
> "If true Market Value is the goal, the potential gallonage—the amount the station should pump if it obtains its share of the business—would be a more reliable yardstick for the income approach, computed at a rental per gallon obtained from the market. In lieu thereof, monthly rentals obtained from the market should produce a dependable income approach."

Plaintiff also spoke of the unfavorable quadrant in which his service station site was located, pointing out that his Standard Station rival, across the road, had the favorable "first off," "no crossover" site in rela-

tion to Interstate 5. However, among the writers, the "last on," "no crossover" site is also good when located next to an interstate highway, and this is the site owned by plaintiff. See 4 Assessors J, *supra,* 71; XXXVI The Appraisal J, *supra,* 563.

The plaintiff testified that he arrived at a true cash value for the years in question for the subject property of $21,000, based on comparable sales. However, he gave no testimony whatsoever as to the comparable sales. Actually, in his testimony, the plaintiff regarded the assessed value of other service station sites as correct and attempted to show why his own assessed valuation was incorrect in comparison to the others. In making these comparisons, he particularly lauded the Highway 66 intersection (South Ashland Junction) as greatly superior to his own site. However, the traffic counts of the State Highway Commission, placed in the record, showed little inequality on the basis of traffic, and it is evident that the southern junction has six stations to divide the traffic as against two presently at the Valley View Road location. If it is true that "traffic is the most important single factor" (5 Assessors J, *supra,* 52), the facts recorded do not favor one site over the other. No expert interpretation of the traffic figures was offered.

The evidence of either side is not compelling and the court finds that the plaintiff failed to prove his asserted value by a preponderance of the evidence. ORS 305.427. Since the record lacks data which would enable the court to make its own determination of true cash value, the assessed value must be affirmed.

Some comfort may be taken from the following: The parties have agreed that the income approach is the best approach in the circumstances, and to this the court agrees. In the present instance, the plaintiff is

receiving $3,780 minimum lease payments per year. If from this amount is subtracted the actual tax payment for the latest year (1971) of $988, an income of $2,792 is left. Capitalized at the eight percent rate used by defendant, there is an indicated true cash value of $34,900, which easily supports the assessed valuation (true cash value) of $34,250. (However, this simple formula, an indication of value which may corroborate the assessor's value only by coincidence, is not offered as a method and is not sufficient alone to reappraise the market value of service station sites in Jackson County. More data and more study are requisite. The county's appraiser has unused tools at his disposal; for example, ORS 308.316.)

The court finds the true cash value of the subject property as of January 1, 1969, and as of January 1, 1970, to be $34,250.